**Christos ORTZIAN, Appellant**

v.

**MCNEILUS TRUCK & MANUFACTURING INCORPORATED; Eastern Concrete Materials Incorporated; ABC Corporation 1–5, fictitious names for manufacturers; John Doe 1–5, fictitious names of manufacturers, distributor and rebuilders.**

**No. 09–1019.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Nov. 18, 2009.

Opinion Filed: Nov. 25, 2009.

Kenneth A. Berkowitz, Esq., Brian E. Mahoney, Esq., Michael B. Zerres, Esq., Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, Chatham, NJ, for Appellant.

Carl Schaerf, Esq., Schnader Harrison Segal & Lewis, New York, NY, for McNeilus Truck & Manufacturing Incorporated.

Before: RENDELL, BARRY and CHAGARES, Circuit Judges.

## OPINION

BARRY, Circuit Judge.

This case arises out an unfortunate workplace accident that occurred in Newark, New Jersey when Christos Ortzian, appellant herein, fell from the platform of a stationary mixing truck. Ortzian was seriously injured, and the effects of the fall continue to manifest themselves through migraines, seizures, anxiety, and related medical problems. He sued the designer and manufacturer of the mixing truck's platform, McNeilus Truck & Manufacturing, Inc. ("McNeilus"), alleging that the platform was defectively designed and lacked appropriate warnings. McNeilus moved for summary judgment, the District Court granted the motion, and Ortzian now appeals. We will affirm.

## I. BACKGROUND

At the time of the accident, Ortzian was employed as a concrete mixing truck driver by Eastern Concrete. McNeilus designed and manufactured the mixer portion of the truck on which Ortzian worked. Ortzian's primary task was to deliver concrete, which was mixed and poured into his truck while it was on Eastern Concrete's premises, to the appropriate locations in a "professional and respectable manner." (Appellee's App. at 182.) Once delivery was complete, he was responsible for cleaning the "charge hopper," which is the mechanism used to transfer the concrete from the mixing truck to a designated location. To carry out this task, he would climb a ladder permanently affixed to the rear side of the truck to an elevated platform measuring approximately twenty-four by twelve inches. While standing on this platform, he would use a hose to wash away any cement residue on the charge hopper.

The elevated platform that Ortzian used on the day of the accident was surrounded on three sides by a single, steel railing. The railing was approximately thirty-three inches above the base of the platform, and the platform had a metal toe plate that extended up a few inches from its edge. The railing and toe plate encircled the platform except for the portion where the ladder met the platform. That opening measured roughly eighteen and a half inches. A truck operator stepped on and off the platform from the ladder through that opening. There were no other safety features on the platform.

On July 27, 2005, Ortzian was standing on his truck's platform cleaning the charge hopper with the water hose he was holding in one hand. As there were no witnesses and Ortzian's memory of the incident is poor, the details of what happened next are largely unknown. Just before falling nine to twelve feet to the ground, Ortzian recalls having both of his feet on the platform and facing the truck. He does not remember in which hand he held the hose, where his other hand was, or whether he was standing or crouching. Ortzian also has no recollection of whether he fell forward, backwards, over the railing, under it, or through the gap where the railing met the platform. It is unclear whether he lost consciousness before he fell or upon hitting the ground, but he does recall it being a "[h]ot, hot" day. (*Id.* at 156.) Medical

reports of the incident note that paramedics arrived at the scene to find Ortzian lying on the pavement beside the mixing truck.

Ortzian filed suit against McNeilus, and the case was removed to the U.S. District Court for the District of New Jersey. By the time McNeilus filed its motion for summary judgment, two claims were remaining: a design defect claim and a failure to warn claim.[1] Among Ortzian's evidence was the testimony of his expert, Robert Reed, who proposed several safety features that he claims would have corrected the alleged defect in the platform's design. The District Court granted summary judgment on the ground that Ortzian failed to raise a material dispute "as to whether the alleged defects caused his injury." (App. at 52.) The Court found that, notwithstanding Reed's testimony as to how the platform was defective without some kind of guard to protect an individual from falling through the eighteen and a half inch gap in the railing or in the space between the platform and the railing, any proposed modifications to the product's design were useless without evidence of causation. Absent evidence of how Ortzian fell, said the Court, "a jury would be left to speculate as to whether McNeilus' alleged negligence in not including the proposed modifications was the cause of Mr. Ortzian's injuries." (Id. at 54–55.)

## II. STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. We "exercise plenary review over the District Court's decision to grant summary judgment," and apply the same standard that it should have applied when ruling on the motion. *Doroshow v. Hartford Life and Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir.2009); *see Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770–71 (3d Cir.2009). Thus, we should only affirm if "there is no genuine issue as to any material fact" and the defendant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding whether there is a genuine issue of material fact, we "view the facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 72–73 (3d Cir.1996) (citations omitted); *see Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n. 7 (3d Cir.2009).

## III. DISCUSSION

Ortzian argues that there was sufficient circumstantial evidence to establish that had the proposed protective measures been in place, he would not have fallen from the platform. In response, McNeilus argues that Ortzian's theory of causation is too speculative given that he has failed to show that the product was defective without those proposed protections and that the alleged defects caused his injuries.

This case is before us based on the diversity of the parties and, therefore, New Jersey tort law applies. *See Lafferty v. St. Riel*, 495 F.3d 72, 75 (3d Cir.2007). One of the elements of a design defect claim in New Jersey requires that the plaintiff show that the defect caused injury to a foreseeable user. *Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710, 716 (1993). Indeed, "[c]ausation is a fundamental requisite for establishing any product-liability action," and this requires a plaintiff to demonstrate that the "defect in the product was a proximate cause of the injury." *Id.* "[C]ircumstantial evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as

---

1. Ortzian conceded that it was appropriate to grant summary judgment on the failure to warn claim. As such, that issue is not before us on appeal. (Appellant's Br. at 15 n. 3.)

'a mere preponderance of probabilities.'" *Kita v. Borough of Lindenwold,* 305 N.J.Super. 43, 701 A.2d 938, 941 (N.J.Super.App.Div.1997) (quoting *Jackson v. Del. L. & W.R. Co.,* 111 N.J.L. 487, 170 A. 22, 24 (N.J.1933)). Although such evidence may be a sufficient basis for decision, the circumstances must be sufficiently strong that they can reasonably form the basis of a jury's conclusion. *See Fedorczyk,* 82 F.3d at 74. Ortzian acknowledges that the circumstances of this case leave crucial questions unanswered.

As the District Court noted, our decision in *Fedorczyk* drives the analysis here. In *Fedorczyk,* the plaintiff slipped while taking a shower in her cabin bathroom aboard a cruise ship. Although the floor of the bathtub was equipped with four anti-skid strips, the plaintiff was unable to recall if, at the time of the fall, her feet were on the strips or in the slippery space between them. Her expert opined that there was not sufficient slip protection, but he also conceded that it would be impossible to prevent slips altogether given the presence of liquid soaps used during bathing. Nonetheless, he concluded that the lack of sufficient anti-slip protection caused the injury. The District Court granted summary judgment for the vessel operator, and we affirmed, holding that "the expert's opinion that inadequate stripping caused Fedorczyk's injuries is not based on any direct evidence or circumstantial evidence of where she was standing when she fell." *Id.* at 75. We found that because "[n]o evidence presented tends to prove Fedorczyk was standing either on or off the stripping at the time she fell," without that evidence, the jury would be left to speculate as to whether the vessel operator's negligence in failing to make the tub more slip resistant was the cause of the injury. *Id.*

Ortzian's attempt to distinguish his case from *Fedorczyk* is unavailing. He argues that, unlike *Fedorczyk,* his case "concentrates not on 'the fall' but on the absence of guarding to check or stop the fall." (Appellant's Br. at 23.) We disagree. We found that a key problem for the plaintiff in *Fedorczyk* was that she could not recall whether her feet were on the anti-slip strips at the time she fell, because if they were, she could not show that the vessel operator's failure to provide sufficient protection caused her fall. Similarly, Ortzian did not know how he fell from the platform and, thus, he cannot say whether one of Reed's proposed modifications would have prevented him from doing so.

Ortzian argues that his expert's testimony buttons up this causation problem. Reed's recommendations for "a swiveling J- or T—bar and the slide-up mid-rail for the gate area," as well as a "mid-rail around the platform perimeter," might have prevented falls both through the eighteen inch gap in the railing where the ladder meets the platform and through the space that exists between the railing and the floor of the platform. (*Id.* at 25.) The District Court, however, found that even assuming these untested protections were in place, the possibility still would exist that Ortzian could have fallen *over* the railing. In responding to this "third way" that he could have fallen, Ortzian points to the following testimony from his expert:

Question: Are you saying that if you encircle the top of the platform, there is no possible way anybody could fall?

Reed: No, as I stated, someone intentionally could jump over.

Question: I'm not talking about intentionally. I'm talking about accidentally.

Reed: I'm sure there would be some incident of negligence that could happen but in the normal task, the normal task, no.

(*Id.*) This testimony, however, is not as helpful as Ortzian might wish. Reed does

nothing to explain "normal task," which is important given that all of the facts as to how Ortzian was positioned before the fall, such as the location of his free hand, are unknown. Reed also concedes that "some incident of negligence" could have caused a person to fall over the railing. (*Id.*) This, too, is a crucial point because it is impossible to foreclose the possibility that Ortzian failed to take appropriate measures to ensure his own safety, such as, for example, by holding the railing with his free hand. In sum, it is not clear that any of Reed's proposed modifications, including encircling the top of the platform, would have prevented a fall.

## IV. CONCLUSION

Because a jury would be required to rely on sheer speculation as to how Ortzian fell and, thus, whether any of the alleged defects was the cause of that fall, summary judgment was properly granted. The order of the District Court will be affirmed.